Jennifer Shockley,                                    Case No. 1:16cv599

        Plaintiff,                                    Judge Michael R. Barrett

           v.

Correctional Healthcare
Companies, Inc.,

        Defendant.

## OPINION & ORDER

This matter is before the Court upon Defendant Correctional Healthcare Company Inc.'s Motion for Summary Judgment.  (Doc. 31).  Plaintiff Jennifer Shockley filed a Memorandum in Opposition (Doc. 35) and Defendant filed a Reply (Doc. 36).  Plaintiff then filed a Sur-reply (Doc. 40) and Defendant filed a Response to Plaintiff's Sur-reply (Doc. 45).

## I.  BACKGROUND

Defendant contracts with correctional facilities to provide healthcare services to inmates.  Defendant provided nursing coverage to the inmates at the Warren County Jail ("Jail").  Plaintiff began working as a Licensed Practical Nurse ("LPN") in the Jail in 2013.  Plaintiff was first employed by Defendant's predecessor, Premier Healthcare, and was then employed by Defendant when it entered into the contract to provide healthcare services for the Jail.

Under the terms of the contract with the Jail, Defendant must maintain at least one nurse on duty at all times.  (Doc. 27, Mary Ann Wollet Dep. at 13-14).  Defendant generally schedules only one nurse per shift.  (Wollet Dep. at 13-14).  At the Jail, nurses

are responsible for (a) passing medication, (b) charting, (c) responding to patient sick calls, (d) checking inmates' blood sugars at scheduled intervals and (e) checking inmate health records and medications in "pre-booking" to determine if he or she was medically acceptable to the jail. (Doc. 35-2, Jennifer Shockley Aff. ¶¶ 10-12). Nurses also serve as first medical responders at the Jail. (Wollet Dep. at 24). When nurses are dispensing medication, they are always accompanied by at least one officer. (Shockley Aff. ¶ 17, Wollett Dep. at 16). An officer is also stationed outside the infirmary when a nurse is examining an inmate. (Shockley Aff. ¶ 19-21; Wollett Dep. at 17).

In 2015, the nurses employed by Defendant, including Plaintiff, complained that Defendants hired additional nurses at higher hourly rates than the existing staff. (Doc. 30, Jennifer Shockley Dep. at 31-32, 138). In response, Defendant increased hourly rates for existing nurses to make up for wage inflation. (Doc. 31-6, Mary Ann Wollet Aff. ¶ 17).

On August 11, 2015, Plaintiff requested the paperwork for FMLA pregnancy leave. (Doc. 28-1 Angela Stevens Dep., Ex. 1). On August 26, 2015, Defendant approved Plaintiff's request for intermittent FMLA leave based on a certification prepared by Plaintiff's OB/GYN, Dr. William Dorsey. (Doc. 35-2, Ex. C). On the certification form, Dr. Dorsey explained that Plaintiff was pregnant, that she was seeing a perinatologist due to her advanced maternal age, that she complained of occasional heart palpitations and that Dr. Dorsey had referred her to an endocrinologist. (Id.)

On the same day that her FMLA leave was approved, Plaintiff left her shift early because she was not feeling well. (Shockley Dep. at 85; Stevens Dep. at 29, 31). The symptoms stemmed from a heart condition which had been diagnosed in 2000.

(Shockley Dep. at 46-47, 52). Plaintiff had previously informed her supervisor, Sylvia Lawson, about her condition. (Shockley Dep. at 53).

The next day, Angela Stevens, Defendant's Human Resource Specialist, informed Plaintiff that Defendant required more information about her heart condition. Stevens explained that while Plaintiff's OB/GYN could complete FMLA paperwork for her maternity leave and pregnancy related conditions, he could not provide certification for Plaintiff's heart condition. (Shockley Dep. at 84-85; Stevens Dep. at 35, 39-40; Stevens Aff. ¶ 10.) Stevens informed Plaintiff that she could not return to work until she submitted the additional certification.

Plaintiff told Stevens that she was going to see a specialist regarding her heart condition. (Shockley Dep. at 73-74, 98-99; Doc. 31-7, Angela Stevens Aff. ¶ 11). Plaintiff later reported to Stevens that the specialist would not complete the FMLA paperwork, and Dr. Matthew O'Connell, her primary care doctor, would complete the paperwork instead. (Stevens Aff. ¶ 11). Dr. O'Connell had been treating Plaintiff for her heart condition since at least 2012. (Shockley Dep. at 61-62). In the FMLA paperwork completed by Dr. O'Connell on September 4, 2015, Dr. O'Connell explained that Plaintiff had a "lifetime condition" that caused "s[hortness] o[f] b[reath]," "chest pain," "lightheaded[ness]," "high risk of falls," "syncope" (temporary loss of consciousness), and "low blood pressure." (Doc. 30-2, Shockley Dep. Ex. 13.)

Defendant informed Plaintiff that it would be providing Dr. O'Connell with additional information regarding her specific duties at the Jail, and that Defendant was holding her out of work pending further information regarding her heart condition. (Stevens Aff., ¶ 13). Defendant provided Dr. O'Connell with a copy of the job analysis and a job

description for the LPN position, and requested that Dr. O'Connell provide additional information regarding Plaintiff's medical condition.   (Stevens Aff., ¶ 14).   On September 18, 2015, Dr. O'Connell completed the paperwork from Defendant.   (Doc. 28-1, Exs. 10, 11).   Dr. O'Connell stated that Plaintiff could not return to work full time without restrictions.   (Id.)   Dr. O'Connell reiterated his initial response on the FMLA certification and stated that Plaintiff needs to "leave [work] when she becomes symptomatic."   (Id.)

Plaintiff maintains that she submitted two letters to Defendant showing that she was able to return to work: a September 14, 2015 letter from Dr. Susan Galbraith, an endocrinologist; and a September 16, 2015 letter from Dr. Brian Schwartz, a cardiologist. (Doc. 35-2, Ex. E).   Plaintiff also maintains that she submitted a September 15, 2015 letter from Dr. O'Connell which states: "My patient, Jennifer Shockley, has not been medically disabled or pulled off work by me from August 26th, 2015 to present.   She has not been medically disabled since 05/20/2015, which was for an unrelated injury."   (Doc. 35-2, Ex. E).   Defendant claims that it never received these letters.   However, Defendant explains that even if it did receive the letters, it would not have changed its determination that because of her heart condition, Plaintiff posed a potential risk to herself, the inmates and the officers in the Jail.

Based on the information provided by Dr. O'Connell, Defendant determined that Plaintiff was not qualified to provide direct-patient care at the Jail.   Defendant explains that if a nurse working in the Jail needs attention because of dizziness, loss of consciousness or a fall, the officer accompanying the nurse would have to choose between leaving his or her post to attend to the nurse, leaving inmates, medication and medical equipment unattended, or to leave the nurse unattended while the officer

4

maintained security.   (Wollet Dep. at 63-64).

Defendant informed Plaintiff she could not return to work in her previous position, but offered Plaintiff a temporary clerical position at the Jail.   (Shockley Dep. at 119-120). Plaintiff did not accept this position.

Defendant states that it terminated Plaintiff's employment on January 6, 2016. (Shockley Dep., Ex. 16).   However, Plaintiff maintains that Defendant terminated her as early as August 27, 2015 – when Defendant would not allow her to return to work – or September of 2015 – when Defendant refused to allow her to return to work after being provided with letters from her doctors stating that she was able to return to work.   Plaintiff points out that she began receiving unemployment benefits in November of 2015.   (Doc. 35-1, PAGEID #1362).

Plaintiff brings the following claims (1) violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*; (2) violation of the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. §2000e(k); (3) pregnancy discrimination under Ohio Revised Code § 4112.01(B); (4) discrimination and failure to accommodate in violation of the Americans with Disability Act, 42 U.S.C. § 12101, *et seq.*; (5) disability discrimination in violation of Ohio Revised Code § 4112.01, *et seq*; (6) "disparate treatment;" and (7) violation of the Equal Pay Act, 29 U.S.C. §206(d).

## II.   ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   The moving party has the burden of showing

an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

### B. <u>Family Medical Leave Act</u>

Under the FMLA, an eligible employee is entitled to twelve weeks of leave each year "[b]ecause of a serious health condition that makes the employee unable to perform the functions of [the employee's] position." 29 U.S.C. § 2612(a)(1)(D). The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA provision. 29 U.S.C. § 2615(a)(1). The FMLA also prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). The Sixth Circuit has recognized two discrete theories of recovery under the FMLA: "(1) the so-called "interference" or "entitlement" theory arising from § 2615(a)(1), and (2) the "retaliation" or "discrimination" theory arising from § 2615(a)(2)." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). The Sixth Circuit has explained:

> Although we have held that a claim for retaliatory discharge is cognizable under either theory, the requisite proofs differ. The interference theory has its roots in the FMLA's creation of substantive rights, and "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of the intent of the employer. *Arban*, 345 F.3d at 401. The central issue raised by the retaliation theory, on the other hand, is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citation and internal quotation marks omitted). In contrast

to the interference theory, "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Id.*

*Id.* at 282 (footnote omitted).

Plaintiff brings FMLA claims under both the interference and retaliation theories. The burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to both interference and retaliation claims which are based on circumstantial evidence. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012).

A plaintiff establishes a prima facie case of interference under the FMLA by showing that: (1) she was an FMLA-eligible employee, (2) the defendant was an "employer" as defined under the FMLA, (3) she was entitled to FMLA leave, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled. *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (citing *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)). Because the FMLA is not a strict-liability statute, the employee also must show that the employer's violation caused him or her harm. *Edgar*, 443 F.3d at 507-508.

A plaintiff establishes a prima facie case of retaliation under the FMLA by showing that: "(1) she availed herself of a protected right under the FMLA by notifying [the defendant] of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Edgar*, 443 F.3d at 508.

"A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). However, in her Response to Defendant's Motion for Summary Judgment,

Plaintiff merely repeats the prima facie elements under the interference theory, and states in a conclusory fashion that she has established a prima facie case. (Doc. 35, PAGEID #1329-1330). Rather than parse through the record on its own, the Court will assume for the sake of argument that Plaintiff has established a prima facie case under both the interference and retaliation theories her FMLA claim.

If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for [plaintiff's] discharge." *Skrjanc*, 272 F.3d at 315. If the employer "articulates such a reason, then [the plaintiff] has the burden of showing that the articulated reason is in reality a pretext to mask discrimination." *Id.*

A plaintiff establishes pretext "by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). Where the employer can demonstrate an honest belief in its proffered reason, however, the inference of pretext is not warranted. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)).

However, the Sixth Circuit has questioned whether the "honest belief" rule should be applied to FMLA interference claims. *Tillman v. Ohio Bell Telephone Co.*, 545 Fed.Appx. 340 (6th Cir. 2013); *see also Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 533 (6th Cir. 2015) (explaining that the district court properly limited its application of the honest belief rule to its analysis of the plaintiff's retaliation claims). Accordingly, Defendant has only argued that the honest belief rule applies to Plaintiff's FMLA retaliation claim, and has not argued that the honest belief rule applies to Plaintiff's FMLA

interference claim.

In response to Plaintiff's interference claim, Defendant explains that it placed Plaintiff on continuous, rather than intermittent, FMLA leave because it had a reasonable belief that Plaintiff posed a "direct threat" to herself and others in the workplace. Defendant explains that for the same reason, it did not restore Plaintiff to her position at the end of her FMLA leave period.

It is at this point, the Court notes that there is some justifiable confusion between Plaintiff's FMLA and ADA claims. Whether Plaintiff was a direct threat is important to the analysis under Plaintiff's ADA claims and will be discussed there. There is no dispute that Plaintiff was already approved for a period of FMLA leave based on her pregnancy when she left work early on August 26, 2016. There is also no dispute that Defendant permitted Plaintiff to take that approved FMLA leave. While Plaintiff points out that her approved FMLA leave was for intermittent leave, and not continuous leave, "[t]he FMLA says nothing about an employer's ability to 'force' an employee to take such leave, and such forced leave, by itself, does not violate any right provided by the FMLA." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 175 (2d Cir. 2006); *see also Wysong v. Dow Chemical*, 503 F.3d 441, 449-450 (6th Cir. 2007) (explaining that "an employer who forces an employee to take leave may create a claim under the FMLA," however to maintain such a claim, a plaintiff must "allege also that she later requested FMLA leave, but that [the employer] refused, based on the fact that she had already used up her available FMLA leave.").

In addition, the FMLA does not require an employer to reinstate an employee "who would have lost his position even if he had not taken FMLA leave." *See* 29 C.F.R. §

825.216(a) ("An employee has no greater right to reinstatement . . . than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.").

Here, after approving Plaintiff for FMLA leave based on her pregnancy, Defendant required additional information regarding Plaintiff's heart condition. In response to Defendant's request for information, Dr. O'Connell, Plaintiff's primary care specialist, explained that Plaintiff had a "lifetime condition" that caused "s[hortness] o[f] b[reath]," "chest pain," "lightheaded[ness]," "high risk of falls," "syncope" (temporary loss of consciousness), and "low blood pressure." (Doc. 30-2, Shockley Dep. Ex. 13.) After receiving information about Plaintiff's job duties, Dr. O'Connell explained that Plaintiff could not return to work full time without restrictions and would need to "leave [work] when she becomes symptomatic." (Doc. 28-1, Exs. 10, 11). Defendant determined that someone with this condition and work restriction could not provide direct-patient care to the inmates at the Jail. Therefore, Defendant did not restore Plaintiff to her previous position based on a legitimate reason which was not related the exercise of her rights under the FMLA.

Plaintiff has not shown that this proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination. Plaintiff relies on the letters from Dr. Galbraith, an endocrinologist, and Dr. Schwartz, a cardiologist, to show that she was able to return to work. Defendant claims it did not receive these letters. However, for purposes of summary judgment, the Court must assume Defendant received these letters. Dr. Galbraith states that the diagnosis is "Thyroid

disease in pregnancy" and "is okay" "from an endocrinology standpoint to return to work." (Doc. 35-2, Ex. E).   Dr. Schwartz states: "It is my medical opinion that Jennifer Shockley has no restrictions and may return to work."   (Id.)   Dr. Schwartz provides no additional information and his opinion conflicts with the opinion of Dr. O'Connell, who stated that Plaintiff must be able to "leave [work] when she becomes symptomatic."   A third letter – Dr. O'Connell's September 15, 2015 letter – does not mention this restriction or Plaintiff's "lifetime condition."   Instead, in this letter, Dr. O'Connell states that he had not pulled Plaintiff off work except for an "unrelated injury" in May of 2015.

The Sixth Circuit has explained "that once an employee submits a statement from her health care provider which indicates that she may return to work, the employer's duty to reinstate her has been triggered under the FMLA." *Brumbalough v. Camelot*, 427 F.3d 996 (6th Cir. 2005).   However, the FMLA regulations also provide: "If the employee is unable to perform an essential function of the position because of a physical or mental condition . . . the employee has no right to restoration to another position under the FMLA."   29 C.F.R. § 825.216(c).   Defendant determined that Plaintiff could not perform the essential functions of her position based on Dr. O'Connell's September 18, 2015, opinion that Plaintiff needs to "leave [work] when she becomes symptomatic."   Dr. O'Connell's opinion was made after Defendant provided him with a copy of the job analysis and a job description for the LPN position.   Even though Dr. O'Connell stated that Plaintiff could return to work, it was not without restriction.   Defendant determined that the restriction meant that Plaintiff could not perform an essential function of her position because Defendant's contract with the Jail required Defendant to provide continuous nursing coverage.   Plaintiff does not dispute that continuous coverage by a

nurse was required, and acknowledges if she left her shift early, she was obligated to find coverage for the remainder of her shift. (Shockley Dep. at 78). The Court concludes that Plaintiff has not shown that Defendant's reason for failing to restore Plaintiff to her previous position were pretextual. Instead, under the FMLA regulations, Plaintiff did not have a right to restoration.

Turning to Plaintiff's claim of retaliation under the FMLA, Defendant explains that it had an "honest belief" that Plaintiff's heart condition rendered her unable to perform her duties as a LPN at the Jail.

The Sixth Circuit has explained the honest belief rule as follows:

> We have adopted the honest belief rule, reasoning that it is not in the interests of justice for us to wade into an employer's decisionmaking process. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007). It is instead the employer's belief, and whether it is informed and nondiscriminatory, with which we are concerned. We do not require that the employer arrived at its decision in an "optimal" matter, *id.* at 599, but that it "reasonably relied on the particularized facts that were before it at the time the decision was made." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (internal quotation marks omitted).

*Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012). Defendant explains that it communicated with Plaintiff about her heart condition, sent a job analysis to Dr. O'Connell, and after receiving the information from Dr. O'Connell, determined that Plaintiff could not return to a position requiring direct-patient care at the Jail. Plaintiff argues that it was not reasonable for Defendant to rely on this information, and Defendant should have conducted a medical examination of Plaintiff.

The FMLA regulations provide that an employer "may have a uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work." 29 U.S.C. §

2614 (c). However, there is nothing in the FMLA regulations which would require Defendant to conduct a medical examination to show that Plaintiff was able to return to work. In fact, the regulations provide that "[n]o second or third opinions on a fitness-for-duty certification may be required." 29 C.F.R. § 825.312(b). Moreover, the Court notes that Defendant offered Plaintiff a position which would allow her to return to work, albeit temporarily. This evidence would seem contrary to a retaliatory motive. *Accord Wells v. Cincinnati Children's Hosp. Med. Ctr.*, 860 F. Supp. 2d 469, 486–87 (S.D. Ohio 2012) (granting summary judgment on the plaintiff's FMLA retaliation claim in part because "the record shows that CCHMC worked diligently to find another placement for Plaintiff once she returned from FMLA leave-behavior that substantially dissipates any inference of a retaliatory motive."). The Court concludes that Plaintiff has not shown that Defendant's proffered reason for not restoring her to her previous position was pretext for retaliation.

Therefore, there is no genuine dispute as to any material fact and Defendant is entitled to summary judgment on Plaintiff's FMLA claim.

### C. **Pregnancy Discrimination Act**

Title VII forbids employers to discriminate against employees "because of . . . sex." 42 U.S.C. § 2000e–2(a)(1). The Pregnancy Discrimination Act added a provision to Title VII's definitions section:

> The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work.....

42 U.S.C. § 2000e(k). Federal caselaw interpreting the PDA is generally applicable to

13

claims brought pursuant to Ohio Revised Code § 4112.01(B), Ohio's analogue to the PDA. *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 471 (6th Cir. 2005). Therefore, the analysis of Plaintiff's PDA claim also applies to her pregnancy discrimination claim under Ohio law.

Plaintiff has not presented any direct evidence of pregnancy discrimination. Where a plaintiff relies upon indirect evidence of pregnancy discrimination to prove her claim, the plaintiff "first has the burden of proving a prima facie case of discrimination; if she is successful, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions; finally, the plaintiff has the opportunity to prove that the proffered reason is pretextual." *Latowski v. Northwoods Nursing Ctr.*, 549 F. App'x 478, 483 (6th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

To establish a prima facie case of pregnancy discrimination, a plaintiff must show that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 573 (6th Cir. 2006) (quoting *Prebilich-Holland v. Gaylord Entertainment Co.*, 297 F.3d 438, 442 (6th Cir. 2002)).

Plaintiff again repeats the elements of this prima facie case and states in a conclusory fashion that she has met her burden. (Doc. 35, PAGEID #1334). Conclusory allegations are not evidence and are not adequate to oppose a motion for summary judgment. *Miller v. Aladdin Temp-Rite, LLC*, 72 F. App'x 378, 380 (6th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d

695 (1990)).   Even if the Court were to grant Plaintiff the benefit of the doubt as to the first three elements, there is nothing in the record to support a finding that Plaintiff has satisfied the fourth element of the prima facie case.

"A plaintiff can prove the fourth element of the prima facie case through comparison to 'another employee who is similarly situated in her or his ability or inability to work [and] received more favorable benefits.'"   *Latowski v. Northwoods Nursing Ctr.*, 549 F. App'x 478, 483 (6th Cir. 2013) (quoting *Ensley–Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996)).   However, Plaintiff has not presented any evidence of similarly-situated employees.   The only evidence in the record of a nexus between Plaintiff's pregnancy and her termination is temporal proximity, but that alone cannot prove pretext.   *Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006) (citing *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 403 (6th Cir. 2003)).

Therefore, there is no genuine dispute as to any material fact and Defendant is entitled to summary judgment on Plaintiff's claim of discrimination under the Pregnancy Discrimination Act and Ohio law.

**D.  Americans with Disability Act**

The Americans with Disabilities Act, as amended by the Amendments Act of 2008 ("ADAAA"), makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).   The ADA defines the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a

disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship."  42 U.S.C. § 12112(b)(5)(A).

Plaintiff asserts two basis of liability under the ADA: (1) wrongful termination; and (2) failure to accommodate.

Plaintiff has also brought claims for discrimination under Ohio law.  Because Ohio's disability discrimination law parallels the ADA, the same analytical framework applies to Plaintiff's claims under Ohio Revised Code § 4112.02 and § 4112.99. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (citing *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 450 (6th Cir. 2007); *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 697 N.E.2d 204, 206-07 (1998)).  Therefore, the analysis of Plaintiff's ADA claims also resolves her state law discrimination claims.  *Id.* (citing *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 452 n.4 (6th Cir. 2004)).

**E.  ADA wrongful termination claim**

Under the ADA, a plaintiff can prove a claim for discrimination based on wrongful termination through direct or indirect evidence.  *Ferrari v. Ford Motor Company*, 826 F.3d 885, 891 (6th Cir. 2016).  Here, Plaintiff has not produced any direct evidence of discrimination, and instead relies on indirect evidence.  When analyzing a discrimination claim based on indirect evidence of discrimination, courts use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1179-182 (6th Cir. 1996)).

Under this approach, the initial burden is on the plaintiff to make out a prima facie case of discrimination by demonstrating that "(1) he or she is disabled; (2) otherwise

qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Barlia v. MWI Veterinary Supply, Inc.*, No. 17-1185, 2018 WL 327448, at *4 (6th Cir. Jan. 9, 2018) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)).

If the plaintiff establishes a prima facie case of discrimination under the ADA, then the burden shifts the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). If the defendant makes that proffer, then the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's proffered reason is merely a pretext for discrimination. *Id.*

## 1. **Disabled**

The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 42 U.S.C. § 12102(2)(B). A person may also be considered disabled under the ADA if they are "regarded as having such an impairment." 42 U.S.C. § 12102(2)(C). The ADA provides that the definition of disability "shall be construed in favor of broad coverage of individuals...." 42 U.S.C. § 12102(4)(A).[1]

---

[1]As the Sixth Circuit has explained, the law governing the definition of "disabled" under the ADA has been recently altered:

> Having concluded that the courts were defining "disability" too narrowly, Congress amended the ADA in 2008 to state that the term should be construed "in favor of broad coverage ..., to the maximum extent permitted by the [ADA's] terms." 42 U.S.C. § 12102(4)(A); ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, § 2, 122 Stat. 3553 (2008). Moreover, Congress explicitly rejected a number of

Plaintiff claims that she was disabled during the time she was employed by Defendant and Defendant regarded her as being disabled. Plaintiff explains that she is claiming a disability based on her pregnancy, not her heart condition. Defendant does not challenge this element of the prima facie case.

### 2. **Otherwise qualified**

The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111. Defendant argues that Plaintiff was not qualified for her position because she posed a direct threat to herself, the inmates at the Jail and other employees at the Jail.

A disabled individual is not "qualified" for a specific employment position if he or she poses a "direct threat" to the health or safety of others which cannot be eliminated by a reasonable accommodation. *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 11 (6th Cir. 2012) (quoting *Estate of Mauro v. Borgess Medical Center*, 137 F.3d 398 (6th Cir. 1998)); *see also Holiday v. City of Chattanooga*, 206 F.3d 637, 647 n. 4 (6th Cir. 2000).

"There are four factors to be considered in a direct-threat analysis: (i) the duration of the risk, (ii) the nature and severity of the potential harm, (iii) the likelihood that the

---

standards formulated by the Supreme Court, such as the requirement that the impairment be "permanent or long-term" to qualify as a disability under the ADA. 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."); ADAAA § 2(b)(4) (stating that a purpose of ADAAA is to "reject ... standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)," which included the requirement that an impairment's impact be "permanent or long-term" to qualify as a "substantial limitation"). Congress also cautioned that "the question of whether an individual's impairment is a disability ... should not demand extensive analysis." ADAAA § 2(b)(5).

*Barlia v. MWI Veterinary Supply, Inc.*, No. 17-1185, 2018 WL 327448, at *4 (6th Cir. Jan. 9, 2018).

potential harm will occur, and (iv) the imminence of the potential harm." *Id.* The Sixth Circuit has explained:

> Whether an employer properly determined that a person poses a direct threat, for purposes of the ADA, depends on "the objective reasonableness of [the employer's] actions." *Bragdon v. Abbott*, 524 U.S. 624, 650, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). An employer's determination that a person cannot safely perform his job functions is objectively reasonable when the employer relies upon a medical opinion that is itself objectively reasonable. *See*, *e.g.*, *Holiday*, 206 F.3d at 645-46; *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005). A medical opinion may conflict with other medical opinions and yet be objectively reasonable. *Bragdon*, 524 U.S. at 650, 118 S.Ct. 2196 ("A health care professional who disagrees with the prevailing medical consensus may refute it by citing a credible scientific basis" for doing so).

*Michael v. City of Troy Police Dep't*, 808 F.3d 304, 307 (6th Cir. 2015).

Defendant explains that the essential functions of Plaintiff's job included: (1) responding to health emergencies within standard guidelines, (2) being alert at all times and paying close attention to details, and (3) working under stress on a regular or continuous basis. (Shockley Dep., Ex. 12). Defendant states that Plaintiff could not perform these essential job functions and posed a direct to herself, the inmates at the Jail and other employees at the Jail. Defendant relies on Plaintiff's "lifetime" heart-related symptoms, including the risk that she could lose consciousness without warning and Dr. O'Connell's work restriction that Plaintiff must be able to leave work when symptomatic. Mary Ann Wollett, Defendant's Regional Manager of Operations, testified that

> [I]n a corrections environment, there is a large risk for a security breach for the person, for the inmates, for the staff if any one of [Plaintiff's symptoms] would take place…[Y]ou have proposed a risk to the officer, you've proposed a risk to the patient, and worse maybe, you've proposed a risk to [the nurse] as a person. If she falls out and becomes incapacitated, you've got rapists, you've got murderers sometimes. You've got sharps, you've got needles...[A] high risk for falls…alone [makes a nurse] so vulnerable inside a secure environment. And a loss of consciousness could be detrimental for patients, for security.

(Wollet Dep. at 63-64).

The Court finds that the record shows that Defendant conducted an individualized inquiry into Plaintiff's actual medical condition, and the impact that condition might have on her ability to perform the job of LPN at the Jail. The risk assessment was based on medical evidence because it was based on the opinion of Dr. O'Connell who had been treating Plaintiff for her heart condition since at least 2012. While Plaintiff argues that her supervisor, Sylvia Lawson, could cover shifts when Plaintiff needed to leave work, "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000). The Court concludes that Defendant's determination that Plaintiff posed a direct to herself, the inmates at the Jail and other employees at the Jail was objectively reasonable.[2]

Therefore, the Court concludes that there is no genuine issue of material fact, and Defendant is entitled to summary judgment on Plaintiff's claims under the ADA and Ohio law.

## F. Equal Pay Act

To establish a prima facie case under the Equal Pay Act, 29 U.S.C. § 206 *et seq.*, the plaintiff must show that the defendant pays different wages to employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Equal Employment Opportunity Commission v. Romeo Community Schools*, 976 F.2d 985, 987

---

[2]Given this conclusion, the Court finds it is unnecessary to address Plaintiff's failure to accommodate claim under the ADA and Ohio law.

(6th Cir.1992) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). Plaintiff states that her Complaint asserts that she received different pay for similar work performed by a male nurse in the Jail and she was retaliated against for having raised the issue. However, in response to a motion for summary judgment, the nonmoving party cannot rest on its pleadings, but must present some "specific facts showing that there is a genuine issue [of material fact] for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. Plaintiff has attached email correspondence from July 29, 2015 and August 26, 2015 where she requested job grade and salary pay range for her job. (Doc. 35-1, PAGEID# 1368, 1369). These emails do not show that Defendant pays different wages to employees of the opposite sex. These emails also do not show retaliation. Plaintiff was only requesting pay information. While there is evidence in the record that Plaintiff, along with other nurses complained about their pay in 2015, "[c]omplaining about one's pay is not statutorily protected; complaining about discriminatory pay is." *Crowder v. Railcrew Xpress*, 557 F. App'x 487, 492 (6th Cir. 2014) (quoting *Shrader v. Palos Anesthesia Assocs., S.C.*, No. 01C 2450, 2004 WL 2167909, at *8 (N.D.Ill. Sept. 24, 2004)).

Therefore, there is no genuine dispute as to any material fact and Defendant is entitled to summary judgment on Plaintiff's claim under the Equal Pay Act.

## III.   **CONCLUSION**

Based on the foregoing, it is hereby **ORDERED** that Defendant Correctional Healthcare Company Inc.'s Motion for Summary Judgment (Doc. 31) is **GRANTED**; and

there appearing to be no more matters for decision before this Court, this matter is

**CLOSED** and **TERMINATED** from the active docket of this Court.

**IT IS SO ORDERED.**

_____/s/ Michael R. Barrett_____

Michael R. Barrett
United States District Judge
